480 A.2d 980

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kevin BRINKLEY, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 13, 1984.

Decided July 13, 1984.

444

Suzanne McGettigan, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Marianne Cox, Asst. Dist. Attys., Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

LARSEN, Justice.

Appellant, Kevin Brinkley, was tried before a jury in the Court of Common Pleas of Philadelphia and convicted of murder of the second degree, criminal conspiracy and robbery. Post verdict motions were filed and denied and, on December 17, 1979, the trial court sentenced appellant to a term of life imprisonment on the murder of the second degree conviction, and to concurrent sentences of five to ten years and ten to twenty years imprisonment for conspiracy and robbery, respectively. This direct appeal of appellant's judgments of sentence was filed on January 4, 1980.[1]

1. At the time this appeal was docketed, this Court had jurisdiction over direct appeals in cases of felonious homicide pursuant to then-in-effect 42 Pa.C.S.A. § 722(1). In the interests of judicial economy, we also assume jurisdiction over the robbery and conspiracy convictions. *See Commonwealth v. Sudler*, 496 Pa. 295, 301–02, 436 A.2d 1376, 1378–79 (1981).

The record discloses the following. On or about 1:00 p.m. on December 22, 1977, Richard Brooke and Charles Haag were making door-to-door Christmas deliveries of fresh poultry and eggs in the Strawberry Mansion section of Philadelphia. As Mr. Haag was about to enter the truck following a delivery, appellant and his accomplice, June O'Bryant, accosted Haag from behind, each wielding a .38 caliber revolver. June O'Bryant went into the truck where he forced Mr. Brooke to turn over the day's proceeds, while outside the truck, appellant fired a single shot into Mr. Haag's chest. Mr. Haag started to run but collapsed on his back in the gutter. Appellant then turned Mr. Haag face down in a puddle, knelt on his neck and back, and rifled his pockets. Appellant and O'Bryant then fled.[2] Mr. Haag died as a result of this gunshot wound.

Appellant's actions were observed by two eyewitnesses who identified appellant as Haag's shooter and testified that they had known appellant for several years. It was also established that Mr. Haag had been killed by an unusual .38 caliber copper-coated bullet. An identical .38 caliber copper-coated bullet was recovered from appellant's residence during the execution of a search warrant.

Appellant's alibi defense was that he was asleep at his aunt's house at the time of the murder. Appellant also sought to establish that his fourteen-year-old brother, Ronald, had committed the murder and that the eyewitnesses had mistakenly identified Ronald as appellant. The jury disbelieved appellant's version of the robbery and homicide and returned the aforementioned convictions. We now affirm the judgments of sentence imposed upon those convictions.

Appellant first argues that the trial court erred in ordering defense counsel to disclose to the Commonwealth certain defense memoranda containing statements of four de-

For reasons not entirely clear from the record, the trial court's opinion in this case was not filed until December 20, 1982.

2. June O'Bryant was separately tried and convicted of murder of the third degree, robbery and conspiracy.

fense witnesses. At trial, seven witnesses were called for the defense. As the prosecutor began to cross-examine these witnesses, he asked each if they had previously given any statements to defense counsel. Four witnesses answered affirmatively and the prosecutor requested that he be allowed to see the statements that defense counsel had taken which were in counsel's possession.[3] Counsel objected to disclosure of the statements, arguing that they were protected against disclosure by the "work product" privilege and that the statements in his possession were actually notes of his recollections, not verbatim or substantially verbatim statements of the witnesses. The court overruled the objections and ordered counsel to allow the prosecutor to examine the statements. However, the court limited the disclosure order, ruling that only the actual statements taken from the witnesses, and nothing else, need be disclosed.[4] On cross-examination, the Commonwealth referred to the prior statements of two of the witnesses, Romona Brinkley (appellant's sister) and Loretta Davis (appellant's mother), in questioning them as to relatively minor discrepancies between the statements and their testimony at trial.[5]

**3.** The four witnesses who had given defense counsel prior statements were Romona Brinkley, Loretta Davis, Delores Leonard and John Leonard. The Commonwealth made use of only two of the statements, to-wit, those of Ms. Brinkley and Ms. Davis.

**4.** In ordering disclosure, the court stated: "But only give him what you took with respect to [the witness]. If you have anything other than that, don't give it to him. He is only entitled to any statements that you took from her as a witness, nothing else." N.T. July 10, 1978 at 560.

**5.** On direct examination, Ms. Davis listed those people who resided with her. On cross-examination, the prosecutor questioned Ms. Davis as to why she had omitted the name of her daughter, Margo, who was mentioned in the pretrial statement as residing with Ms. Davis. The witness explained that Margo had only recently moved out. N.T. July 10, 1978 at 770–71.

Ms. Brinkley's trial testimony varied slightly from her prior statement regarding whether the witness knew why appellant had chosen to sleep in a particular room on the afternoon of the murder and as to how many times the witness had attempted to wake appellant. N.T. July 10, 1978 at 593–96, 600.

Appellant contends that the court erred in ordering disclosure of these statements over his objections. We disagree.

■ While an attorney's work product is privileged against disclosure, the privilege is a qualified one. *Lepley v. Lycoming County Court of Common Pleas,* 481 Pa. 565, 573, 393 A.2d 306, 310 (1978). The "protective cloak" of the qualified work product privilege "does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation." *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947).

■ It is well established that where the Commonwealth has in its possession pretrial statements of its witnesses which have been reduced to writing and relate to the witness' testimony at trial, it must, if requested, furnish copies of these statements to the defense. *Commonwealth v. Gartner,* 475 Pa. 512, 381 A.2d 114 (1977). So too, where the defense attorney possesses pretrial statements of witnesses, the needs of the criminal justice system require disclosure.

As this Court recently stated:

It must be remembered, however, that our system of criminal justice is a search for truth. As the Supreme Court of the United States observed, "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." (Citations omitted). So too, the American Bar Association Project on Minimum Standards for Criminal Justice states: "Where life, liberty and protection of communities from crime are the stakes, *gamesmanship is out of place.*" Standards Relating to Discovery and Procedure Before Trial § 1.1 Comment at p. 31 (Approved Draft 1970). (emphasis added)

*In the Matter of Pittsburgh Action Against Rape,* 494 Pa. 15, 24, 428 A.2d 126, 130 (1981) (Larsen, J., dissenting on the grounds that the need for disclosure in that case was outweighed by the need for a rape counselor-rape victim

privilege, a privilege which has since been legislatively created. 42 Pa.C.S.A. § 5945.1). And, as Chief Justice Burger stated in *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974):

> The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for production of evidence needed *either by the prosecution or the defense.* (emphasis added)

From the foregoing, it is clear that the statements of the witnesses in defense counsel's possession were not protected against disclosure by the work product privilege, especially in light of the trial court's narrowly drawn disclosure order. Appellant also asserts that the trial court should not have ordered disclosure because it was not demonstrated that the memoranda in defense counsel's possession were actually the witnesses' statements. It is true that statements made by a witness prior to trial are subject to disclosure only when they are signed, adopted or otherwise shown to be substantially verbatim statements of that witness. *Commonwealth v. Cain*, 471 Pa. 140, 369 A.2d 1234 (1977); *Commonwealth v. Wade*, 480 Pa. 160, 389 A.2d 560 (1978). It is clear from the record that the material subject to the court's disclosure order was, in fact, the substantially verbatim statements of the witnesses. N.T. July 10, 1978 at 538, 559–61, 607–610, 766–771.

Appellant's next assignment of error stems from several gratuitous references made by a defense witness to a polygraph examination that had been taken by appellant's brother, Ronald Brinkley. During the prosecution's cross-examination of Loretta Davis regarding Ronald's confession, the following colloquy took place:

[By the Commonwealth]

Q. Did Ronald Brinkley, on page 9, [of his statement to the police], the last question that Detective Grady asked him when Grady said, "Why are you confessing to a

crime that you did not commit," did your son Ronald say, "Yes, I didn't do it, but neither did Kevin"?

[Ms. Davis]

A. No, he didn't. *He say if my son said, "If you think I'm lying, give me a lie-detector test," and Detective Grady gave him a lie-detector test and came back upstairs and told me that my son was lying.* And I said—said to Detective Grady, I said, "You call me to come down here to do the right thing. Now you going to have me sit down here all day and then tell me my son is telling a lie." Because my only interest was, was getting the right son and getting the truth out. I'm not trying to protect, I'm not trying to protect Ronnie. I'm only trying to protect the one that did it because I don't feel that the wrong one had to be punished for something that they didn't do. So you can all confuse me. I'm talking the truth. The truth speaks for itself.

N.T. 806 (emphasis added).

After the witness blurted out the above response, the Commonwealth asked for a sidebar conference to discuss the unresponsive answer to the prosecutor's question. The trial court noted for the record that the witness was behaving in a very emotional manner during her testimony, and that the witness' answer was totally unresponsive to the question posed by the prosecutor. N.T. 806–810.

The next morning, defense counsel moved for a mistrial based upon Ms. Davis' reference to the polygraph in her testimony of the prior day. The trial court denied this request as untimely and the cross-examination of Ms. Davis continued. The final question posed to the witness on cross-examination was:

Q. One last question please. *If you would, pay attention to the question and just answer it the way it is asked.*

On February 16, 1978, while your son was in the room with yourself—and by your son I mean Ronald—was in the room with Detective Grady, did your son or did not your son Ronald Brinkley deny to Detective Grady that

he participated in the killing of the eggman; did he deny it or not?

A. No, he did not. He said, "Give me a lie-detector test. If you don't believe me, give me a lie-detector test." That's why my son said.

N.T. 824 (emphasis added).

Defense counsel immediately moved for a mistrial based on this reference to the polygraph. The trial court denied this motion but issued extensive cautionary instructions to the jury to completely disregard *any* reference to a polygraph test because such tests are inherently unreliable and inadmissable in Pennsylvania. N.T. 824–825.

Appellant alleges that the trial court erred in denying counsel's initial motion for mistrial as untimely. Objections to references to polygraph tests must be made as soon as the reference occurs. *Commonwealth v. Smith,* 497 Pa. 626, 410 A.2d 787 (1980); Pa.R.Crim.Pro. 1118(b).[6] The trial court, therefore, properly denied defense counsel's untimely motion for mistrial made on the day following Ms. Davis' first reference to a polygraph test.

Appellant also alleges that the trial court erred in denying the motion for mistrial made immediately following Ms. Davis' second reference to a polygraph test. A trial court is required to grant a mistrial only where the alleged prejudicial event may reasonably be said to have deprived the defendant of a fair and impartial trial. *Commonwealth v. Rolison,* 473 Pa. 261, 274, 374 A.2d 509, 514, *cert. denied,* 434 U.S. 871, 98 S.Ct. 215, 54 L.Ed.2d 150 (1977). The defense witness' reference to Ronald Brinkley's polygraph was an emotional and unresponsive answer to the prosecution's narrowly framed question which was not designed to elicit or exploit Ms. Davis' original reference to the polygraph. In fact, the question was tailored to avoid the reference. Moreover, the witness' second reference did not

6. Pa.R.Crim Pro. 1118(b) provides as follows:
 "When an event prejudicial to the defendant occurs during trial only the defendant may move for mistrial; the motion shall be made *when the event is disclosed.* Otherwise the trial judge may declare a mistrial only for reasons of manifest necessity."

suggest the result of Ronald's test, whether negative or otherwise. Finally, the trial court issued immediate and extensive instructions regarding the unreliability and inadmissibility of polygraph tests and cautioning the jury to disregard any testimony concerning such tests. In light of all of the foregoing circumstances, appellant could not have been prejudiced in any manner by Ms. Davis' gratuitous references to a polygraph examination, and the trial court did not err, therefore, in denying appellant's motion for a mistrial. *See Commonwealth v. Miller*, 497 Pa. 257, 439 A.2d 1167 (1982); *Commonwealth v. Richardson*, 496 Pa. 521, 437 A.2d 1162 (1982).

Appellant next contends that the trial court erred in excluding certain portions of Ronald Brinkley's confession from being introduced by the defense. At trial, Ronald Brinkley's confession was presented into evidence through the testimony of Loretta and William Davis. As Ronald Brinkley was unavailable to testify (because he indicated he would invoke the Fifth Amendment privilege against self-incrimination if called to the stand), the court allowed substantially all of the confession to be introduced under the "declaration against penal interest" exception to the hearsay rule. *Commonwealth v. Colon*, 461 Pa. 577, 337 A.2d 554 (1975), *cert. denied*, 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976). The court, however, excluded the following portions of the confession:

"Q. Was there anybody with you and June or were you the only two involved?

"A. The only two"

. . .

"Q. Was Kevin involved?

"A. No.

"Q. Did your brother Kevin have anything to do with this?

"A. No"

*See* N.T. July 5, 1978, 123–131 and July 10, 1978, 766.

As this Court has made clear, those portions of a statement made by an out-of-court declarant which are not

inculpatory, such as statements that another person was not guilty of the crime, are not "declarations against penal interest" and are not admissible under that hearsay rule exception. *Commonwealth v. Colon, supra,* 461 Pa. at 583–85, 337 A.2d 557–58; *Commonwealth v. Anderson,* 501 Pa. 275, 288–89, 461 A.2d 208, 214–15 (1983). Accordingly, the trial court did not err in refusing to allow the above-quoted portions of Ronald Brinkley's confession to be introduced at trial.

■ Finally, it is contended that appellant was deprived of the effective assistance of counsel in several particulars. The standard of review for ineffectiveness of counsel claims is two-pronged. Initially, counsel will not be deemed ineffective for failing to raise baseless issues. *Commonwealth v. Arthur,* 488 Pa. 262, 265, 412 A.2d 498, 500 (1980). When the claim which has been foregone is of arguable merit, we must then determine whether there was some reasonable basis for counsel's action that was designed to effectuate his client's interests. *Commonwealth v. Anderson, supra* at 501 Pa. 286, 461 A.2d 208.

■ With these standards in mind we address appellant's ineffectiveness claims. First, appellant claims that counsel was ineffective in failing to timely move for a mistrial after defense witness Loretta Davis made her initial reference to the polygraph examination of Ronald Brinkley. As previously discussed, there would have been no arguable merit to such a motion.

■ Appellant also claims that trial counsel was ineffective in failing to preserve his objection to the exclusion of one portion of Ronald Brinkley's confession. This assertion is frivolous for the objection was, in fact, preserved for appellate review.

Lastly, appellant argues that trial counsel was ineffective in failing to object to several allegedly improper comments of the prosecutor during closing argument and/or to request cautionary instructions to the jury to disregard the comments complained of. The standards for reviewing the

effect of allegedly improper closing comments of a prosecutor are well-settled. As we stated in *Commonwealth v. Van Cliff,* 483 Pa. 576, 582–83, 397 A.2d 1173, 1176 (1979):

"[C]omments by the district attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. McNeal,* 456 Pa. 394, 400, 319 A.2d 669, 673 (1974) (citations omitted). "[W]hether this standard has been violated by the language of the district attorney is not in the first instance our decision to make. It is the duty of the trial judge to rule upon the comments; this Court is limited in its review to whether the trial court abused its discretion." *Commonwealth v. Simon,* 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). "We recognize that a district attorney must have reasonable latitude in fairly presenting a case to the jury, and that the trial judge must have reasonable discretion in deciding whether the bounds of propriety have been exceeded." *Commonwealth v. Cronin,* 464 Pa. 138, 143, 346 A.2d 59, 62 (1975).

*See also Commonwealth v. Stoltzfus,* 462 Pa. 43, 61, 337 A.2d 873, 882 (1975).

■■■■ Of course, where no objection has been made to the allegedly improper comments, the trial court has had no opportunity to exercise its discretion. The reviewing court must, in this situation, examine the comments to determine whether an objection would have had arguable merit. *Commonwealth v. Hubbard,* 472 Pa. 259, 283–286, 372 A.2d 687, 698–700 (1977); *Commonwealth v. Tabron,* 502 Pa. 154, 465 A.2d 637 (1983). If so, we must then, if possible, determine from the record whether counsel had some reasonable basis for failing to object. *Id.* If such a determination is not possible from the record, a remand for an evidentiary hearing may be appropriate. *Cf. Commonwealth v. Watts,* 488 Pa. 214, 217–218, 412 A.2d 474, 476 (1980).

■ We have examined the prosecutor's closing argument in light of the foregoing principles and find no evidence of ineffectiveness for failing to object to the comments complained of. Appellant first claims that the prosecutor "expressed his personal opinion as to the guilt of the appellant," but offers no transcript references to support this assertion nor does our review of the record support this claim.

Appellant next asserts that the prosecutor expressed his personal "belief that various members of the appellant's family ... were not truthful ... [and] gave the jury panel his impression that the appellant's family was engaged in a scheme to implicate appellant's brother." Appellant also contends that the prosecutor's reference to his brother as "the great imposter" was improper. These assertions are without merit for these remarks amount to nothing more than fair commentary on the evidence presented at trial.

The Commonwealth's theory of the case was, indeed, that appellant's family had devised a scheme to achieve appellant's acquittal. The scheme was this: Ronald would confess to the crimes and, so, appellant would be acquitted; Ronald would face trial on the charges then, but the testimony of the eyewitnesses, who had testified unequivocally that appellant was the perpetrator, would be used by the defense at Ronald's trial to gain his acquittal. The prosecutor merely offered the Commonwealth's theory to the jury, telling the panel "[i]f my theory doesn't comport with the evidence, throw it out but please think about it for a minute before you do that." N.T. July 13, 1978 at 1039. The prosecutor then gave his recollection of the defense witnesses' testimony, pointing out the inconsistencies and contradictions presented. Moreover, both the prosecutor and the court repeatedly cautioned the jury that the arguments and recollections of counsel were not to be taken as evidence and that it was up to the jury to resolve issues of credibility. We find nothing arguably objectionable in this regard.

Similarly, we find no prejudice or basis for objection in the prosecutor's final comment to the jury to "tell Kevin

Brinkley and tell Ronald Brinkley and tell the people of this city that the little game doesn't work, that you are not going to put up with it ...." N.T. July 13, 1978 at 1056–57. Under the circumstances of this case, the "little game" reference was no more than the reiteration of the Commonwealth's legitimate theory regarding the defense. Furthermore, the "prosecutor's statement merely reflected considerations that the jury would undoubtedly have considered even absent the articulation of them by the prosecutor. ... [F]airness dictates that the prosecution must also have a degree of latitude in the exercise of advocacy in its position." *Commonwealth v. Tabron, supra* at 502 Pa. 160–161, 465 A.2d 640.

Appellant further claims that the prosecutor made improper "attempts to inflame the jury by references to possible personal experiences of the jury" by the following comments:

> Well, in the first place, does someone with a bullet through their heart act reasonably? And secondly, when you get shot, don't you get a little upset? Luckily, I hope none of us have ever been shot. I can say I never have and I hope nobody among you have, or no one in your family has. I think some of you told us that some of you had injuries in your family. But when you get shot, doesn't it make you upset and make you want to vindicate what happened to you?

The record clearly shows that these remarks were made in response to defense counsel's suggestion that the eyewitness account of Adrienne Williams—that she thought the victim began to chase appellant after being shot—was unbelievable.

The final assertion of improper commentary concerns the following introduction to the prosecutor's summation of the case:

> [N]obody took movies of what happened on the 22nd of December. The cameras just weren't rolling like in Kojack or Police Story. We can't put a projector up here

and a screen and show you what really happened. You have got to decide.

But although we don't have movies, you have probably all been in penny arcades at one time and you have probably walked into those arcades—a year ago it probably cost a nickle, it probably costs a dime now or a quarter—but there are still some machines in there called nickleodians. You put in your change or whatever it requires. And you have a handle. And when you turn that handle there are a lot of still pictures in front of you, but if you turn the handle fast enough, those still pictures turn into a movie. And I suggest to you that the evidence suggests in this case, that we didn't see one movie, we are seeing a double feature.

Back in the 1960's, someone by the name of Truman Capote wrote a book and they turned it into a movie and by chance I happened to see that it is being shown this Friday night. It's called "In Cold Blood". I suggest to you that the evidence indicates in this case that the star here is Keir Dullea. The star in this case is Kevin Brinkley. But I think you saw another movie. Back in the early 60's, Tony Curtis starred in a movie called the Great Imposter. I suggest to you the evidence in this case indicates that the star or the great imposter in this courtroom is someone by the name of Ronald Brinkley. But you decide that. Let's look at what was shown in those two movies.

Without further references to movies, the prosecutor then offered his summation to the jury. Appellant argues that the comparison between himself and the star of *In Cold Blood* was calculated to, and did in fact, "inflame and prejudice the members of the jury". We do not agree. While the prosecutor's theatrical comparison may have been poorly chosen, we think it apparent, in the context of the record as a whole, that the reference to certain movies was simply a dramatic device intended to put the jury's task into perspective, that is, the task of making a "movie" from the "still pictures" (the evidence) presented. Moreover, we

hardly think the jury could have been swayed by this passing reference to a movie that was more than fifteen years old, the violence level of which had been more than equaled in 1978 by daily, prime-time television fare.

For the foregoing reasons, we reject appellant's assertions that trial counsel was ineffective for failing to object to the prosecutor's comments in closing argument.

Judgments of Sentence affirmed.

NIX, C.J., filed a Concurring Opinion.

HUTCHINSON, J., concurred in the result.

NIX, Chief Justice, concurring.

I concur in the result of the majority affirming the trial court's overruling of defense counsel's objection to the order that he disclose certain defense memoranda concerning the statements of four defense witnesses on the limited grounds that the only reason offered in support of the objection was properly rejected. I strenuously disagree with the majority's suggestion that the Commonwealth was entitled to this information.

I.

The sole argument raised before the trial court and on this direct appeal with respect to the court-ordered discovery of the statements in question was that this material was the attorney's work product and was, therefore, privileged against disclosure. As the majority correctly concludes, the material disclosed would not fall within any accepted definition of "attorney work product." Pa.R. Crim.P. 305(G); *Lepley v. Lycoming County Court of Common Pleas*, 481 Pa. 565, 393 A.2d 306 (1978); *see also Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *United States v. Nobles*, 422 U.S. 225, 242, 95 S.Ct. 2160, 2172, 45 L.Ed.2d 141 (1975) (White, J., concurring); *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). By basing his objection on privilege, defense counsel waived all other grounds on which to attack

460

the propriety of the disclosure order. *See Commonwealth v. Berrios*, 495 Pa. 444, 434 A.2d 1173 (1981); *Commonwealth v. Williams*, 476 Pa. 557, 383 A.2d 503 (1978); *Commonwealth v. Rivera*, 470 Pa. 131, 367 A.2d 719 (1976); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). The argument that the discovery was not available under our Rules, therefore, was not before the trial court and cannot be properly considered by this Court.

## II.

If defense counsel had preserved that issue for review by objecting on the grounds that disclosure of the subject statements was outside the parameters of Pennsylvania Rule of Criminal Procedure 305, the admission of the statements would have been error. Absent a specific authorization by the Rules of Criminal Procedure, the prosecution is not entitled, as a matter of right, to the discovery or inspection of any evidence in the possession of the defense. *Lewis v. Court of Common Pleas of Lebanon County*, 436 Pa. 296, 260 A.2d 184 (1969). No decision of this Court before today has ever interpreted Rule 305 as conferring such a right either expressly or by reasonable implication. Although a majority of the Court may now consider it appropriate to create such a right, that right was non-existent when the instant trial occurred. Thus, there was no basis on which to permit discovery of the statements.

## III.

What compels me to write separately is the majority's unnecessary attempt to bolster its conclusion that the statements were not "work product" with dicta which implies that the Commonwealth should be entitled to full reciprocal discovery in criminal prosecutions. I strongly disagree with such a suggestion. The right to discovery of the prosecution witnesses' prior statements after they testified on direct examination was granted to the defense because those statements might be material to the jury's credibility determination and thus critical to a determination of guilt or

innocence. *In The Matter of Pittsburgh Action Against Rape,* 494 Pa. 15, 428 A.2d 126 (1981); *Commonwealth v. Hamm,* 474 Pa. 487, 378 A.2d 1219 (1977); *Commonwealth v. Cain,* 471 Pa. 140, 369 A.2d 1234 (1977); *Commonwealth v. Grayson,* 466 Pa. 427, 353 A.2d 428 (1976); *Commonwealth v. Morris,* 444 Pa. 364, 281 A.2d 851 (1971); *Commonwealth v. Kontos,* 442 Pa. 343, 276 A.2d 830 (1971); *Commonwealth v. Smith,* 417 Pa. 321, 208 A.2d 219 (1965). Since the prior statements might prove to have an exculpatory purpose, we ruled that fairness demanded disclosure to defense counsel. *Commonwealth v. Hamm, supra.* No corresponding consideration of policy justifies the granting of a reciprocal prosecutorial right.

Ultimately the state's information gathering advantage belies the contention that discovery rights between the prosecution and defendant should be coextensive. It would be a mockery of due process if the state could, in addition to relying on its infinitely more effective position as an investigating body and its superior resources, compel the defendant to lighten the prosecution's burden of proving its case through the discovery process. *Murphy v. Waterfront Comm.,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). Indeed the United States Supreme Court recognized this proposition in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), wherein it stated that "the State's inherent information gathering advantages suggest that if there is to be any imbalance in discovery rights, it should work in the defendant's favor." *Id.* at 475 n. 9, 93 S.Ct. at 2212 n. 9. That fundamental proposition was further emphasized by Mr. Justice Douglas in his concurring opinion:

The Bill of Rights does not envision an adversary proceeding between two equal parties. If that were so, we might well benefit from procedures patterned after the Rules of the Marquis of Queensberry. But the Constitution recognized the awesome power of indictment and virtually limitless resources of government investigators.

462

Much of the Bill of Rights is designed to redress the advantage that inheres in a government prosecution.

*Id.* at 480, 93 S.Ct. at 2215 (Douglas, J., concurring). Therefore, I must emphasize that any suggestion of the existence of a reciprocal discovery right in this instance would ignore the realities of our criminal justice system, and would impermissibly tip the balance of advantage even more heavily in the prosecution's favor.*

---

* It should be noted that Pa.R.Crim.P. 305(C) does provide for some degree of reciprocity in situations where disclosure by the defense would not be unfair.